USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-25-07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

JAMES MAHONEY, as Director of the : 
Transport Workers Union Local 100
Retirees' Association and Plan :
Administrator of the TRANSPORT
WORKERS UNION LOCAL 100 RETIREES :
ASSOCIATION HEALTH BENEFIT PLAN,
JOSEPH ALLMAN, BERNARD BEAVER, :      04 Civ. 2592 (VM)(HBP)
FRANK INGRAM, LAVERENE STUCKEY,
MAURICE SCHIERMAN and MATTHEW :
TARNOWSKI,                            OPINION
                              :       AND ORDER
                    Plaintiffs,
                              :

     -against-                :

JJ WEISER AND COMPANY, INC., :
SANFORD J. COHEN, HARVEY T.
GLUCK, MICHAEL J. FITZPATRICK :
and JOHN MEEHAN,
                              :
                    Defendants.    :

------------------------------------X

          PITMAN, United States Magistrate Judge:

I.   Introduction

          Defendants move to strike the report of plaintiff's

expert, Mr. Elliot Leitner, and to preclude Mr. Leitner from

testifying as an expert in this matter (Docket Item 70).  For the

reasons set forth below, defendants' motion is denied in all

respects.

II.  Facts

   A.  Background

      Plaintiffs' allegations are set forth in detail in the
February 13, 2005 Opinion and Order of the Honorable Michael B.
Mukasey, United States District Judge (now retired), granting in
part defendants' motion to dismiss the complaint.[1]  Toussaint v.
JJ Weiser & Co., 04 Civ. 2592 (MBM), 2005 WL 356834 (S.D.N.Y.
Feb. 13, 2005).  Familiarity with this decision is assumed.  For
the purposes of the present motion, the abbreviated summary of
the allegations set forth below is sufficient.

      Plaintiffs are the current Director of the Transport
Workers Union Retirees Association (the "Association"), partici-
pants in a health benefits plan (the "Plan") that is open to
members of the Association and the Administrator of the Plan
(Amended Compl. ¶¶ 1,4, 6).  Defendant JJ Weiser & Company
("Weiser") is an insurance brokerage that helped issue the Plan
to the Association.  Defendants Cohen and Gluck are the president
and vice-president, respectively, of Weiser (Amended Compl. ¶¶ 7-
15).  Defendants Fitzpatrick & Meehan are former directors of the
Association (Compl. ¶¶ 18-19).

---

    [1]After Judge Mukasey's retirement, this matter was
reassigned to the Honorable Victor Marrero, United States
District Judge.

In 1978, the Transport Workers Union obtained a Limited Medical Expenses and Accidental Death and Dismemberment Policy (the "Policy") from Interboro Mutual Insurance Company ("Interboro") and Weiser.  All the members of the Retirees Association are certificate holders in the Policy.  The Policy had three parts and offers relatively modest benefits.  Part I provides for reimbursement of out-of-pocket costs for blood replacement, the cost of oxygen and the rental of crutches, wheelchairs and hospital equipment for home use.  Part II provides accidental death and dismemberment coverage in the amount of $2,000.  Part III provides Hospital Income Benefits of $75 per week for stays in acute care hospitals and $37.50 per week for up to four weeks of convalescent care.  Toussaint v. JJ Weiser & Co., supra, 2005 WL 356834 at *2.

During the three-year period from 2001 through 2003 Plan participants received a total of $72,148.86 in benefits; during this same period the participants paid a total of approximately $714,605 in contributions to Weiser as Plan admin-istrator (Amended Compl. ¶ 23).  Plaintiffs estimate that from 1978 through 2003, Plan participants paid approximately $8,750,000 to Weiser yet received benefits of approximately $971,250 (Amended Compl. ¶ 25).  Plaintiffs allege that the benefits paid under the Plan are disproportionate to the contributions paid and that defendants "breached their fiduciary

3

duties to the Plan and its participants and beneficiaries and committed prohibited transactions [in violation of] Sections 404, 405 and 406 of ERISA" (Amended Compl. ¶ 1; see Amended Compl. ¶¶ 34-39).

B.  Plaintiff's
    Proposed Expert

To support their claim of breach of fiduciary duty, plaintiffs have designated Mr. Elliot Leitner as an expert witness.  Mr. Leitner has worked in the fields of life and health insurance for more than fifty years; within the last four years he has testified in approximately 25 state and federal proceedings as an expert witness concerning the insurance industry.

Plaintiffs' counsel identified six opinions that plaintiff will seek to offer from Mr. Leitner:  (1) there is a custom in the health insurance industry concerning claim-loss[2] ratio; (2) there is a standard concerning what the claim-loss ratio should be with respect to group health plans; (3) that the standard at all relevant times was 70-75%; (4) the Policy did not comply with that standard; (5) when a group health policy had a claim-loss ratio below sixty per cent, it is the custom in the insurance industry for the "insurance professional providers"

―――――――――――――――

[2]"Claim-loss" ratio is the ratio of benefits paid pursuant to an insurance policy to the premiums collected.  It is calculated by dividing the former number by the latter.

4

involved to advise the policy holder of the disparity between premiums and benefits; (6) that Weiser knew or should have known of the disparity between premiums paid under the policy and benefits received and (7) when a group health policy had a claim-loss ratio below sixty per cent, it is the custom in the insurance industry for the "insurance professional providers" involved to advise the policy holder of other opportunities to seek a refund, to obtain reduced lower premiums, to seek insurance from a different insurer that offers lower premiums, to seek increased benefits in order to bring the claim-loss ratio into line with the industry standard or to recommend self-insuring.

I held a <u>Daubert</u> hearing in this matter on October 12, 2007 at which Mr. Leitner testified to the following facts.

Mr. Leitner has worked in the insurance industry in differing capacities for 50 years. From 1947 through 1957, he was employed by Guardian Life Insurance Company in various departments. At the time he left Guardian, he supervised the claims department. From 1957 through 1959, Mr. Leitner was employed by Aetna Insurance Company as an insurance agent, selling life, medical, accident, casualty and health insurance. From 1959 through 1961, Mr. Leitner worked for Security Mutual Life of New York as an associate general agent. In that capacity, Mr. Leitner supervised and trained agents and sold health, life and medical insurance. From 1961 through 1971, Mr. Leitner

worked for American General Life Insurance Company of New York as a vice president.  Mr. Leitner supervised American General's claims department for medical and life insurance and prepared policies as the head of the policy owners service department. From 1971 through 1994, Mr. Leitner worked for North American Company for Life and Health as a senior vice president and member of the board of directors.  As senior vice president, Mr. Leitner was responsible for claims for medical, life, accident and health insurance benefits.  He also headed North American's group insurance business and serviced policy holders.  While Mr. Leitner was with North American, the company provided group health insurance for several hundred groups.

Since his retirement from North American, Mr. Leitner has served as an arbitrator for the New York Stock Exchange, the National Association of Securities Dealers and has testified as an expert on various subjects relating to the insurance industry on more than 100 occasions.

Mr. Leitner also testified that he is a long-term member of a number of professional associations including the International Claims Association, the Chicago Claims Association, the Midwest Claims Conference, the Eastern Claims Conference and the American Counsel of Life Insurers.  Some of these groups have monthly meetings; others have annual meetings.  Mr. Leitner has attended these meeting for approximately 30 years.  In the

aggregate, thousands of insurance companies attended the meetings held by these associations.  These associations conduct educational workshops at their periodic meetings at which claim-loss ratios and other subjects are discussed.

During the course of his career, Mr. Leitner has worked with medical expense, accidental death and dismemberment and hospital income policies.  While he was employed by American General, the company issued these types of policies to between 50 and 100 groups.  While Mr. Leitner was with North American, the company issued these types of policies for a "few hundred" groups.

Mr. Leitner testified that, based on his employment in the insurance industry, information he has learned through his attendance at numerous trade association meetings, information he has received from other insurance companies and published statistics compiled A.M. Best Company and Ward Financial Group, the industry standard for claim-loss ratio is between 70% and 75% for medical expense and hospital income policies, i.e. claims expenses are ordinarily 70-75% of premiums paid .  Mr. Leitner further testified that while he was at North American and American General, premiums would be partially refunded and/or reduced if the claim-loss ratio fell below 60%, whether or not there was a provision in the policy requiring this adjustment.

Mr. Leitner also testified that North American and American General's business practice of partially refunding premiums when the claim-loss ratio fell below 60% was consistent with what he understood to be the industry standard based on his experience in the industry, his attendance at trade association meetings and communications from other companies. If a claim-loss ratio fell below 60%, Mr. Leitner testified that either premiums would be refunded or reduced or the policy benefits would be upgraded in order to bring the claim-loss ratio up to the 70-75% range. He stated that even in the absence of a contractual obligation to do so, he has seen premiums refunded under these circumstances "hundreds" of times. Mr. Leitner stated that claim-loss ratio for the policy in issue in this litigation -- 8%-11% -- was inconsistent the industry standard for group health insurance plans, resulted in the participants in the plan paying an excessive amount in premiums and the broker receiving an excessive amount in commissions.

Mr. Leitner also believed that based on his understanding of Weiser's duties with respect to the policy, it would have been aware of the disparity between premiums and benefits because it was a third-party-administrator and had access to information concerning both premiums and benefits paid. Under industry standards, Mr. Leitner opined that believed Weiser had an obligation to disclose the disparity to the Plan's members.

8

III.   Analysis

Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579

(1993), established that the trial court has a gatekeeping duty

under Rule 702 to ensure that expert testimony admitted under

Fed.R.Evid. 702 is "not only relevant, but reliable."  See

Daubert v. Merrell Dow Pharm., Inc., supra, 509 U.S. at 589.

"[The Supreme] Court clarified [in Kumho Tire Co. v. Carmichael,

526 U.S. 137, 152 (1999)] that, whether a witness's area of

expertise was technical, scientific, or more generally

'experience-based,'" the district court was required to "fulfill

the 'gatekeeping' function of 'mak[ing] certain that an expert,

whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellec-

tual rigor that characterizes the practice of an expert in the

relevant field.'"  Nimely v. City of New York, 414 F.3d 381, 396

(2d Cir. 2005), quoting Kumho Tire Co. v. Carmichael, supra, 526

U.S. at 152.  The burden of establishing that proffered expert

testimony complies with Rule 702 lies with the party offering the
testimony.  <u>Berk v. St. Vincent's Hosp. & Med. Ctr.</u>, 380 F.
Supp.2d 334, 349 (S.D.N.Y. 2005).

Performance of the gatekeeping function requires a
trial court to conduct a three-part inquiry.  In order to testify
as an expert, (1) a witness must be qualified as an expert, (2)
his opinion must be based upon reliable data or methodology and
(3) the opinion must assist the trier of fact.  <u>Nimely v. City of
New York</u>, <u>supra</u>, 414 F.3d at 397; <u>Berk v. St. Vincent's Hosp. &
Med. Ctr.</u>, <u>supra</u>, 380 F. Supp.2d at 349-50.

The Supreme Court in <u>Daubert</u> set forth a non-exclusive
list of factors for courts to consider in assessing the reliabil-
ity of an expert's reasoning or methodology.[3]  Although these
factors are properly applied where the opinion in issue is the

---

[3]These factors have been summarized as follows:

> (1) whether the theory or technique on which the expert
> relies has been tested-that is, whether the expert's
> technique can be challenged in some objective sense, or
> whether it is instead simply a subjective, conclusory
> approach that cannot reasonably be assessed for
> reliability; (2) whether the theory or technique has
> been subject to peer review and publication; (3) the
> known or potential rate of error of the technique or
> theory when applied; (4) the existence and maintenance
> of standards controlling the technique's operation; and
> (5) whether the theory or method has been generally
> accepted by the expert community.

<u>Trouble v. The Wet Seal, Inc.</u>, 179 F. Supp.2d 291, 301 (S.D.N.Y.
2001), <u>citing</u> <u>Daubert v. Merrell Dow Pharm., Inc.</u>, <u>supra</u>, 509
U.S. at 593-94.

product of an experiment or analysis, such as the chemical

analysis of an unknown substance for the presence of cocaine or

heroin, they have little applicability where, as here, the

opinion is based on professional experience and there really is

no methodology or technique supporting it.   As explained in

Trouble v. The Wet Seal Inc., supra, 179 F. Supp.2d at 301:

> The test of reliability, however, is a "flexible"
> one, and the factors set forth in Daubert do not con-
> stitute a "definitive checklist or test."   See Kumho
> Tire, 526 U.S. at 150, 119 S.Ct. 1167 (quoting Daubert,
> 509 U.S. at 593, 113 S.Ct. 2786).

> Whether the Daubert factors are pertinent to
> assessing reliability in a particular case depends on
> "the nature of the issue, the expert's particular
> expertise, and the subject of his testimony," and "a
> trial court should consider the specific factors iden-
> tified in Daubert where they are reasonable measures of
> the reliability of expert testimony."   Kumho Tire, 526
> U.S. at 150, 119 S.Ct. 1167.

Thus, the fact that Mr. Leitner's opinion cannot be assessed by

the factors identified in Daubert does not ipso facto mean that

it fails under Rule 702.

Where, as here, an expert's opinion is based on the

expert's experience, courts focus on the relationship between the

experience and the opinion and whether the latter is rationally

related to the former.   See Crowley v. Chait, 322 F. Supp.2d 530,

538 (S.D.N.Y. 2004) ("An expert may indeed be excluded when his

training and experience is lacking in the particular area in

which his testimony is offered.").   For example, in SR Int'l Bus.

Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 113 (2d

11

Cir. 2006), the issue was whether the infamous attacks on the World Trade Center that occurred on September 11, 2001 constituted one occurrence within the meaning of the insurance policy issued to the property interests.  One of the issues on appeal was the admissibility of testimony from the property interests' expert concerning the meaning of a "per occurrence" provision in an insurance policy.  The proffered expert -- McKinley -- had 31 years of experience in the insurance industry including 23 years as a broker specializing in property insurance and four years as an underwriter in the field of property insurance.  In the course of his career, McKinley had reviewed hundreds of "per occurrence" property insurance forms.  The Court of Appeals concluded that McKinley's testimony was admissible not withstanding absence of a methodology to support the opinion.

> The insurers offer three main criticisms:  (1) McKinley lacked practical experience on which to ground his opinion, (2) McKinley employed no genuine methodology and drew upon no external reference points in reaching his opinion, and (3) McKinley could not offer a consistent, reliable methodology by which he applied his opinions to the facts of this case.  All of these arguments fail.

> The insurers recognize that an expert may be qualified based on his experience.  See Fed.R.Evid. 702 (stating that an expert may be qualified based on "knowledge, skill, experience, training, or education").  They contend, however, that such an expert "must show how his or her experience (here, experience in the property insurance industry) led to his conclusion or provided a basis for his opinion."  And we agree.  McKinley, however, was able to satisfy these criteria.  He testified that he had over 30 years of experience in the insurance industry (as both an under-

> writer and a broker) and he was familiar with practices
> in the industry, including the practices that related
> to "per occurrence" property provisions.  He explained
> that through these experiences, he was able to identify
> a practice whereby insurers tie the definition of
> occurrence to a physical cause of loss in order to
> maximize the number of deductibles that an insured
> would be required to pay.  And he testified that insur-
> ers used "hours" clauses when they wished to aggregate
> the losses associated with specific perils-e.g., hurri-
> canes and earthquakes.  The fact that McKinley was not
> aware of any instance where his understanding of custom
> and practice had been applied to a terrorism case is
> hardly surprising given the unprecedented nature of the
> September 11 attacks; fortunately, insurers have not
> had to adjust many terrorism losses.

467 F.3d at 132-33.

Similarly, in Seneca Ins. Co. v. Wilcock, 01 Civ. 7620
(MHD), 2007 WL 415141 (S.D.N.Y. Feb. 5, 2007), plaintiff moved to
preclude defendants' expert from testifying to the usage in the
insurance industry of the terms "loss" and "claim," contending
that the testimony did not meet the Daubert standard.  The Court
denied plaintiff's motion, stating:

> In substance, [defendant's expert] is primarily
> seeking to proffer testimony as to industry usage of a
> term.  That form of testimony does not really fit
> within the analytical framework of Daubert, see id. at
> 589, 592-93, which addresses scientific testimony and
> has since been expanded to encompass other forms of
> technical testimony that may not fall within the rubric
> of science.  See Kumho Tire Co. v. Carmichael, 526 U.S.
> 137, 147 (1999).  Indeed, the Supreme Court has made it
> clear that the Daubert factors will not always offer
> the most appropriate guidance for an assessment of
> expert testimony due to the wide range of experts and
> expertise sought to be invoked in various types of
> litigation.  Id. at 150 ("[T]he factors identified in
> Daubert may or may not be pertinent in assessing reli-
> ability, depending on the nature of the issue, the
> expert's particular expertise, and the subject of his

13

> testimony.") (citation omitted).  For example, the
> absence of any publication by [defendant's expert] or
> any peer review of his opinions is essentially irrele-
> vant to their admissibility.  Moreover, although plain-
> tiff asserts that Shapiro's method is not testable, all
> that he is doing is to recount his experience concern-
> ing the use of certain terms in the industry.  Such
> testimony is of course testable, in the sense that
> industry practice is provable (or disprovable) by
> equivalent testimony by experienced participants in the
> industry.

2007 WL 415141 at *9.  See also Crowley v. Chait, supra, 322 F.

Supp.2d at 539 (The "methodology of proffered nonscientific

testimony need not be subjected to rigorous testing for scien-

tific foundation or peer review," so long as "the methodology

employed was rooted in the experts' practical experience.").

Defendants' challenge to Mr. Leitner's opinions is not

cast in the language traditionally used to frame a Daubert

objection.  Although defendants claim Mr. Leitner is not quali-

fied, (Memorandum of Law in Support of Defendants' Joint Motion

to Preclude Plainitffs' Expert and Strike Plaintiffs' Expert

Reports, dated July 31, 2007 ("Defendants' Memo"), at 6), their

real argument appears to be the putative lack of basis for Mr.

Leitner's opinion.

To the extent defendants are asserting an attack on Mr.

Leitner's qualifications, their objection is baseless.  Mr.

Leitner has substantially more experience than the insurance

experts approved in SR Int'l Bus. Ins. Co. v. World Trade Ctr.

Props. LLC, supra, 467 F.3d at 132 and Seneca Ins. Co. v.

14

Wilcock, supra, 2007 WL 415141 at *9, and, as he testified, he
has experience in the health insurance field.  Given his exten-
sive experience, he is well suited to opine on the relationship
between the claim-loss ratio for the policy in this case and the
claim-loss ratio routinely seen in the industry.

> In assessing whether a witness can testify as an
> expert, courts have liberally construed the expert
> qualification requirement.  United States v. Brown, 776
> F.2d 397, 400 (2d Cir.1985); Cary Oil Co., Inc. v. MG
> Refining & Mktg., Inc., No. 99 Civ. 1725 (VM), 2003 WL
> 1878246, at *1 (S.D.N.Y. Apr. 11, 2003).  "[An] expert
> should not be required to satisfy an overly narrow test
> of his own qualifications." Valentin v. New York City,
> No. 94 Civ. 3911 (CLP), 1997 WL 33323099, at *14
> (E.D.N.Y. Sept. 9, 1997) (citations and quotations
> omitted).  "In considering a witness's practical
> experience and educational background as criteria for
> qualification, the only matter the court should be
> concerned with is whether the expert's knowledge of the
> subject is such that his opinion will likely assist the
> trier of fact in arriving at the truth." Id. at *14.
> As a result, one may be an expert solely based on one's
> practical experience notwithstanding a lack of
> professional education or one's formal education
> despite a lack of practical experience. Id. at *15;
> United States v. Angelilli, 660 F.2d 23, 39-40 (2d Cir.
> 1981).

Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., 04 Civ.
7369 (LTS), 2006 WL 2128785 at *5 (S.D.N.Y. July 28, 2006).
Defendants' contention that Mr. Leitner does not have experience
with the precise type of insurance policy in issue here goes to
the weight of Mr. Leitner's testimony, not its admissibility.
McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043 (2d Cir. 1995)
("quibble[s]" with an expert's experience on specific points of a
case were "properly explored on cross-examination and went to his

testimony's weight and credibility -- not its admissibility").

Given Mr. Leitner's fifty years of experience in the insurance

industry, I conclude that he is qualified to testify as an

expert.

I also conclude that Mr. Leitner's opinions satisfy the

second step of the <u>Daubert</u> analysis and are rationally based on

his experience.  Mr. Leitner testified that in the course of his

experience, he worked with health and medical insurance policies

and had access to the premium and claims information of the

companies at which he was employed.  Mr. Leitner also had access

to claim-loss ratio information with respect to other insurers

through his participation in professional associations.  Mr.

Leitner has also cited and relied on two industry publications --

<u>Best's Aggregates & Averages</u> and <u>Ward's Insurance Results</u> --

which are statistical compilations of the actual claims experi-

ence of life and health insurers.  The data in these publications

supports his conclusions concerning the existence of an industry

standard regarding claim-loss ratio.  Given the array of Mr.

Leitner's work experience, his long-time membership in industry

associations and attendance at their meetings, and the existence

of empirical evidence corroborating his conclusion, I conclude

that Mr. Leitner's opinions concerning the industry standard

claim-loss ratio are sufficiently reliable to be admissible.

I also conclude that Mr. Leitner's testimony concerning the response in the industry to a disproportionately low claim-loss ratio and what Weiser should have known regarding the claim-loss ration is also sufficiently reliable to be admissible. Although these opinions lack the existence of corroborating empirical evidence, Mr. Leitner testified that he has seen premiums refunded on hundreds of occasions even without a con-tractual provision requiring such refunds and was familiar with the duties of third-party administrators such as Weiser. These facts render the opinion sufficiently reliable to be admissible.

Defendants argue in opposition that Mr. Leitner's testimony is merely his personal _ipse dixit_ and is indistinguish-able from the expert testimony excluded in Berk v. St. Vincent's Hosp. & Med. Ctr., supra, 380 F. Supp.2d 334 and Algarin v. New York City Dep't of Corr., 460 F. Supp.2d 469 (S.D.N.Y. 2006).  I conclude that defendants' arguments are not persuasive and that Mr. Leitner's testimony _is_ distinguishable from the testimony offered in these two cases.

Berk was a medical malpractice action, and the central issue was the defendant physician's response to a report from a patient who had undergone knee surgery that "synovial fluid"[4] was

_____

[4]Synovial fluid is "[a] transparent viscid lubricating fluid secreted by a membrane of an articulation, bursar, or tendon sheath also called joint fluid."  Baker v. Apfel, Civ. A. 99-2565,  2000 WL 703794 at 5 n.2 (E.D. La. May 30, 2000).  Thus, it
(continued...)

17

leaking from the site of the incision.  The expert "testimony"
offered suffered from a multitude of defects.  First, it was in
the form of an unsworn report, which, without more, rendered it
an inadequate response to defendants' summary judgment motion.
Berk v. St. Vincent's Hosp. & Med. Ctr., supra, 380 F. Supp.2d at
352-53.  Second, the report was not based on a version of facts
that was supported by the evidence offered by either side.
Rather the report was based on a "hybrid" view of the facts which
took some facts from plaintiff's version of the relevant events
and some from defendants'.  Berk v. St. Vincent's Hosp. & Med.
Ctr., supra, 380 F. Supp.2d at 353.  Third, to the extent plain-
tiff attempted to rely on a snippet of the expert's deposition
testimony that the discharge of synovial fluid was indicative of
infection, the testimony was excluded because it lacked any
scientific basis and merely reflected the expert's personal
experience.  The expert offered no explanation concerning why the
leakage of the normally occurring synovial fluid indicated
infection.  Berk v. St. Vincent's Hosp. & Med. Ctr., supra, 380
F. Supp.2d at 355.  In this case, on the other hand, Mr.
Leitner's testimony is not only corroborated by empirical
statistical evidence, it is the product of his observations in an

---

[4](...continued)
appears that its presence in the knee is normal.

industry in which he has worked for approximately one-half
century.  Factual bases for Mr. Leitner's testimony were offered.

In <u>Algarin v. New York City Dep't of Corr.</u>, <u>supra</u>, 460
F. Supp.2d 469, a corrections officer sought to recover damages
for his involuntary psychiatric commitments.  Plaintiff offered
an expert to establish that the assessments that resulted in his
commitments were not performed in conformity with the standards
of the medical profession and, therefore, gave rise to a Due
Process violation.  The Court found that the expert was not
relying on any identifiable standards, but rather was merely
opining how he believed the assessment should have been con-
ducted.

> Dr. Kammerman's failure to identify generally
> accepted standards governing involuntary commitment
> also undercuts his analysis of the individual defen-
> dants' performances, as he has no benchmark against
> which to judge the individual defendants.  Dr.
> Kammerman does not evaluate the individual defendants'
> performances according to any particular accepted
> methodology, cite to any pertinent medical literature,
> or employ any other evidence in support of his
> conclusion that the doctors made some bad choices.  As
> a result, Dr. Kammerman's report cannot be read to
> express any more than simply his personal disagreement
> with the individual defendants' treatment decisions.
>
> At the end of his report, Dr. Kammerman opines
> that "[n]one of the doctors involved in using the
> mental health laws to confine this plaintiff
> involuntarily met minimal community standards for
> medical practice regarding assessment for
> dangerousness." Kammerman Report at 16.  But this
> conclusion is not the product of the application of any
> analytic method, aside from Dr. Kammerman's personal
> experience, and Dr. Kammerman cites no support for it,
> other than his occasional allusions to "common sense."

> Taken as a whole, his report is not based on reliable principles and methods and is not helpful to the task at hand.  Accordingly, the Court finds Dr. Kammerman's report inadmissible under <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579, 592-97, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Fed.R.Evid. 702.

<u>Algarin v. New York City Dep't of Corr.</u>, <u>supra</u>, 460 F. Supp.2d at 477.

  <u>Algarin</u> is distinguishable largely for the same reasons that <u>Berk</u> is distinguishable:  Mr. Leitner did identify the industry standards on which he relied and did identify the bases for his beliefs as to those standards; he did cite empirical evidence supporting his conclusions and he did identify the insurance companies whose conduct contributed to his opinions. In short, he was not testifying as to his personal belief as to what the claim-loss ratio should be, he was testifying as to the claim-loss ratios he had routinely seen with respect to other, similar policies and identifying the policy in issue as an outlier.

  Defendants also challenge Mr. Leitner's testimony on the ground that it does not establish industry standards that are "fixed and invariable" (Defendants' Memo at 15).  This issue, however, goes to the sufficiency of Mr. Leitner's testimony.  <u>See</u> <u>SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC</u>, 467 F.3d at 134.  Accordingly, the argument does not raise a <u>Daubert</u> issue and is more properly considered by Judge Marrero in connection with the parties' dispositive motions.

20

IV.   Conclusion

        Accordingly, for all the foregoing reasons, defendants'
motion to strike the report of plaintiffs' expert, Mr. Elliot
Leitner, and to preclude Mr. Leitner from testifying as an expert
in this matter (Docket Item 70) is denied in all respects.

Dated:  New York, New York
        October 25, 2007

                                SO ORDERED


                                _____
                                HENRY PITMAN
                                United States Magistrate Judge


Copies transmitted to:

Susan M. Jennik, Esq.
William Schimmel, Esq.
Kennedy, Jennik & Murray, PC
113 University Place
New York, New York  10003

Daniel G. Ecker, Esq.
Traub, Eglin, Lieberman Straus LLP
7 Skyline Drive
Hawthorne, New York  10532

Jordan Sklar, Esq.
Babchik & Young LLP
200 East Post Road
White Plains, New York  10601

Suzanne Tongring, Esq.
Suite 1232
60 East 42nd Street
New York, New York  10165


                    21