# EXHIBIT A

**Charles W. Bowden, CLU, ChFC**
c/o Ringwood Consulting Group, Inc.
PO Box 17, Pompton Lakes, NJ 07442-0017

**EXPERIENCE:**

Individual Life Sales and Recruiting; Specialties include Retirement and Pre-Retirement Planning through the sale of Individual Fixed and Variable Life and Annuities both as a producer and a recruiter. Have extensive experience in Whole Life, Universal Life and Variable Life in the Business Markets selling COLI, Business Continuity Planning, Group Term Life Insurance and Group Disability and all types of Group Health care coverage. Experience with Defined Benefit, 403(b), 401(k), 457, and IRA plans. Experienced legal witness and Qualified Continuing Education instructor in Pennsylvania and New Jersey.

- In 1992 sold over $168,000 of first year Life Insurance Premium as an Individual producer
- In 1995, working as a recruiter, produced over $12 million in Annuity premium.
- In 1999, Summit Financial's number four producer after just 16 months experience.

**PRINCIPAL** ConPert, Inc. - 1989 to Present
Design of Business Continuity using Employee Stock Ownership Plans and Insurance. Consulting in all forms of Life, Disability and Long Term Care and Annuities. Legal consultation. Continuing Education course design and classroom presentation

**ASSOCIATE PARTNER** - Summit Insurance Advisors - 1998 to 2001
Sales of business and personal life and disability insurance to bank clients.

**ACCOUNT EXECUTIVE** - Roster Financial, Inc. - 1993 - 1995
Recruiting independent agents to sell annuities and life insurance.

**PRESIDENT -**          Tailored Time Shops, Inc. - 1986 - 1990
                         Involved in all aspects of retail sales operations of Women's Read-to-Wear Stores.

**PRODUCT SPECIALIST -**    Word Systems, Inc. - 1983 - 1985
                            Sale of Computer, Word Processing and peripheral devices.

**EDUCATION: LEHIGH UNIVERSITY** - B.A. History
**THE AMERICAN COLLEGE**
Chartered Life Underwriter (**CLU**) - Conferred - October 23, 1990.
Chartered Financial Consultant (**ChFC**) - Completed - June 19, 1992.
Certificate - Personal Financial Planning - October, 1990
Master of Science in Financial Services (**MSFS**)
Matriculated - 1995
Completed six parts of ten
P.A.C.E - Charter Member - Qualified through December 2001
HEALTH INSURANCE ASSOCIATION of AMERICA- Part II Course 2.
R & R NEWKIRK      - Pension and Profit Sharing.
Charitable Giving Through Life Insurance
XEROX PROFESSIONAL SELLING SKILLS - Part I - Basic Selling
Part II - Trainer's course

**LICENSES:**    Life Insurance, Accident & Health; Resident New Jersey; Non-Resident; Ohio, Pennsylvania, and
                 New York,
           N.A.S.D Series 6 and 63

**AFFILIATIONS:**  Society of Financial Service Professionals - South Jersey Chapter Member - Former Board Member

Estate and Financial Planning Council of South Jersey - Ocean-Monmouth Chapter - Active Member

National Association Of Insurance and Financial Advisors - Atlantic County Chapter - Active Member

Gift Planning Council Of New Jersey - Member

Supreme Court of New Jersey District Fee Arbitration Committee - District IIIA - Member



## ConPert, Inc.

568 E. Revere Way
Smithville, New Jersey 08205-3229
Telephone: (609) 404-0257 Fax: (609) 404-0267

June 12, 2007

Mr. Daniel G. Ecker                     Mr. Jordan Sklar
Traub Eglin Lieberman Straus LLP        Babchik & Young
Mid-Westchester Executive Park          200 East Post Road
Seven Skyline Drive                     White Plains, New York, 10601
Hawthorne, New York 10532

Re:    Mahoney v. J. J. Weiser
       Your File:    514.0264

Gentlemen:

I have reviewed the second supplemental report and addenda supplied by the TWU's expert, Leitner.
The addenda are irrelevant to any argument that either he or I presented. As Leitner clearly admits in
his supplemental report, the product sold to the TWU is generally no longer available through any
carriers.[Leitner Supp Rep p.1]  Leitner also admits that there are no historical studies available of
similar benefits plans.  Any claim by Leitner that relates to a loss ratio or commission levels,
therefore, is immaterial to a review of this case.  There is no available comparison.

Moreover Leitner admits that there is no replacement coverage, as was the discovery of Weiser.
Weiser could not threaten to take the TWU benefit package elsewhere as there was no elsewhere to
place the benefit package.

It is noted that the dissimilar groups Leitner witnessed had a 70% to 75% loss ratio,  but the benefits
of those plans were not of the type that were provided to the TWU. [Leitner, Supp Rep. p. 1]  The
result is that the TWU has followed the only cost saving course available to the Retiree's Benefit
program in hiring a TPA.

Leitner has heaped opinion upon opinion in his supplemental report. The forty plus pages of Best's
and Ward's aggregate results have no relevance to this discussion. There are no other references in
his report or the supplemental report that add authority to his position.  Leitner's apparent claim is
that a loss ratio of 11% derived from a few isolated years experience and a  unique insurance
program is inconsistent with loss ratios for other types of insurance programs. Leitner's position is
completely unsupported by the evidence Leitner supplies and is inconsistent with my experience.

Should you need additional assistance or comment, please feel free to call me.

Respectfully submitted,

## *Charles W. Bowden, CLU, ChFC*

Charles W. Bowden, CLU, ChFC
Principal, ConPert, Inc.

# ConPert, Inc.

568 E. Revere Way
Smithville, New Jersey 08205-3229
Telephone: (609) 404-0257 Fax: (609) 404-0267

May 9, 2007

Mr. Daniel G. Ecker
Traub Eglin Lieberman Straus LLP
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York 10532

Mr. Jordan Sklar
Babchik & Young
200 East Post Road
White Plains, New York, 10601

Re:   Mahoney v. J. J. Weiser
        Your File:      514.0264

Gentlemen:

You have asked me to opine regarding the activities of the insurance agency of J. J. Weiser & Company and Sanford Cohen and Harvey T. Gluck, (Weiser) as they relate to an insurance package provided to the Retirees' Association of the Transport Workers Union (TWU). This review is prompted by a litigation to recoup alleged overpayment of commissions to Weiser & Company by the Union.

The documents that I have reviewed in arriving at my opinions are listed at the end of this report in the Appendix. My opinions are based on my education, training, and experience developed in my 30 years of practice as an independent life and disability insurance broker, as an employee benefits representative for several major insurance companies, and the documents I reviewed. All opinions expressed are to a reasonable degree of professional certainty. I respectfully reserve the right to amend this report upon receipt of additional pertinent information, should it be presented to me for review.

## Background:

Sometime in the early 1970's the Transport Workers Union ( TWU) set up an association to benefit the employees of long service who had earned retirement status within the union. [Dep. Ex.: Cohen, 5; Dep. Ex.: Gluck, 18]

Retirees of the TWU are covered by the union-negotiated contract for the same benefits provided to the regular active employees. When retirees become eligible for Medicare, they are also provided benefits that fill in many of the gaps left un-reimbursed by Medicare coverage. With all the coverage provided by Medicare and by the union supplemental coverage, however, there



# ConPert, Inc.

Mr. Daniel G. Ecker
Mr. Jordan Sklar
May 9, 2007
Page, 2

are still uncovered medical expenses. [Dep. Toussaint, p. 129 -130]  Additionally, when a retiree enters the hospital there can be extraordinary expenses that arise.

### Limited Medical Expense Policy/ Hospital Income Rider:

Interboro Mutual Indemnity Insurance Company (Interboro) created a "Limited Medical Expense and Accidental Death and Dismemberment" policy, their policy number 651, originally dated 1/1/78. [Dep. Ex.: Gluck 15; Dep. Ex.: Cohen, 2].  The policy covered the cost of:

1. Replacement of blood and its transfusion
2. Ambulance service limited to $15 per call
3. Oxygen
4. Crutches
5. Rental of a standard wheel chair
6. Rental of a standard hospital bed with or without traction apparatus for home use.

These items are all excluded from Medicare coverage.

Additionally, the policy provided an Accidental Death and Dismemberment schedule. If a covered individual was killed by accidental means, the policy would pay a death benefit of $1,500.  Moreover, should a covered individual lose sight or limbs, there was a schedule of payments ranging from $750 to the full $1,500.

Effective as of 1/1/81, a Hospital Income rider was added to the Limited Medical Expense Policy.  [Dep. Ex. Gluck 16; Dep. Ex. Cohen 3]   Should a covered participant require hospitalization, after a waiting period of several days, the participant would be reimbursed at the equivalent of $100 per week for the remainder of his/her hospital stay. The benefit was provided on a pro rata basis.  Thus, one day of a hospital stay over the waiting period would provide one seventh of the weekly benefit.

The policy was issued to the Transport Workers Union.  Participating members were given certificates of coverage as evidence of their participation under the master policy issued to the TWU.  To be a covered participant, a retiree would have to pay the retiree dues of $10 per year and the full premium for the coverage.   Coverage was available for a retiree at $35 per year. Should the retiree wish to cover his/her spouse, the premium was $65 per year.

### Group Insurance v. Association Insurance:

Group insurance is written on a mass but limited underwriting basis.  On the policy effective date, all active employees are covered if they fit into a covered classification pertaining to their

# ConPert, Inc.

Mr. Daniel G. Ecker
Mr. Jordan Sklar
May 9, 2007
Page, 3

employment. A group policy can be written either on a contributory basis, which requires that the employee bear some percentage of the cost of coverage, or on a non-contributory basis, where the employer bears the total cost of coverage. The benefits offered to the Retiree's Association by Weiser were fully paid by the participants. There was no contribution by the TWU or the Retirees' Association to the cost of the coverage offered to the participants.

If the employer bears the full cost of coverage, all active employees must be covered. If a contribution is required of the participant employees to affect coverage, 75% of the eligible employees must elect to participate in the coverage. The health of the participants is not reviewed individually. Health questions are not asked of the participant, because the greater percentage of all employees participate in the coverage. The insurer is getting both the healthy with the unhealthy, on a random basis. The premiums assume that there are healthy participants and unhealthy participants.

When providing true group insurance coverage, a carrier will offer rates assuming that the group will present healthy and unhealthy participants. In effect the healthy are bearing some cost for the unhealthy. Participation requirements are established to make sure that the healthy elect to participate, not just the unhealthy. Anti-selection or adverse selection against the insurer is avoided because of these mandates.

The TWU retirees' policy was an association plan. The offering was to retirees, who could elect to participate or not. Of the eight thousand potential retiree participants, only a plurality of the eligible group participated. [Dep. Mahoney, p. 70; Dep. Ex. Mahoney 6, Bate stamp 002486; Dep. Ex., Cohen 25, TELS 0402; Dep. Ex., Cohen 27, TELS 0339] Because fewer than 75% of the membership participated in the coverage, there was a possibility that those in ill health were the most likely responders to the solicitation. Moreover, the participants were solicited on an annual basis, therefore, the participants could opt in and out at will from year to year.

Insurance companies willing to underwrite true employer group insurance policies are unwilling to underwrite association policies. No credible alternative insurers were found who were willing to provide the same coverage offered by Interboro. [Dep., Cohen, p. 59: Dep. Mahoney, p. 194]. Neither Weiser nor Wilkie and Associates Inc., an agency brought to the table by the new TWU management, could find a replacement carrier.

New management at the TWU elected to terminate the Interboro policy and Weiser services sometime in 2004. [Dep. Mahoney, p. 180; Dep. Cohen, p. 196 - 197] A Third Party Administrator (TPA), Alicare, was hired. [Dep. Mahoney, p. 73 -74: Dep. Ex., Mahoney 13, p. 001867] Contrary to Mr. Mahoney's assertion that Alicare is an insurer, all Alicare does is pay claims to the specification of the "Summary Plan Description." Under TPA Alicare's administration, should claims exceed premium income paid by the participants, the TWU, not Alicare, would be responsible for making up the short fall.



# ConPert, Inc.

Mr. Daniel G. Ecker
Mr. Jordan Sklar
May 9, 2007
Page, 4

## Policy Administration:

Interboro entered into an agreement with Weiser to have Weiser act as agents to market Interboro's insurance policies. The execution date of the original agreement was in 1970. [Dep. Ex., Gluck 36; Dep. Ex., Cohen 34] The commission offered to Weiser was 30% of premiums collected on behalf of Interboro. At that time, the Weiser agency was located in and enjoyed office space free of rent from Interboro. [Dep. Cohen, p. 207: Dep. Gluck 124] In 2002, the agreement with Weiser was modified to provide a commission of 40%. [Dep. Ex. Gluck 37; Dep. Ex. Cohen 35]

The commission increase was offered to Weiser to compensate them for leaving the Interboro Home Office. Interboro was growing and needed to occupy the space then occupied by Weiser. The increase in commissions was offered to compensate Weiser for their additional expense assumed by Weiser for having to relocate and pay rental costs for space outside Interboro's Home office. [Dep. Cohen p. 207; Dep. Gluck, p. 124]

Weiser, at its own expense, produced enrollment flyers to be sent to all the eligible members of the Retirees Association. Printing and postage expenses were borne by Weiser. [Dep. Ex., Cohen 8, 9, 10, 11, and 13; Dep. Ex., Gluck, 21, 22, 23, 26, and 27] The TWU collected the incoming premium. [Dep., Cohen p. 60; Dep. Gluck p.40] TWU then forwarded enrollment information to Weiser and the accounting of the insurance premium fell to Weiser. Weiser remitted premiums to Interboro and sent dues to the TWU. [Dep., Cohen, p. 67]

Weiser also performed certain claims administration duties. Office staff at Weiser would correspond with claimants and providers to collect information necessary so Interboro could evaluate submitted claims. Weiser would receive claim payments from Interboro and forward them to the TWU. [Dep. Ex., Cohen 16; 24; 26 and 27] Additionally, Weiser would send out the letters informing participants that the participant's claim had been denied by Interboro as per Interboro's contract provisions. [Dep. Ex. Cohen, Dep. Gluck Numerous] Interboro, however, not Weiser, determined the validity of submitted claims. Weiser did not have discretion as to which claims were paid or denied.

When viewed in its totality, measuring all the responsibilities assumed by Weiser, a thirty or forty percent commission is not out of line. When TWU management terminated the Weiser relationship, all functions previously handled by Weiser had to be assumed by TWU management.

There was no evidence presented in the aggregate of the discovery provided, that former TWU management personnel or Retirees' Association management benefitted personally from Weiser.



# ConPert, Inc.

Mr. Daniel G. Ecker
Mr. Jordan Sklar
May 9, 2007
Page, 5

More importantly, the commissions paid to Weiser related to an association group, not an employer group. Greater responsibilities on the part of Weiser earned greater income. An employer group standard cannot be applied in this case, because the duties assumed were greater than those assumed by an agent selling true employer group insurance. A better comparison would be to compare commissions of an agency that sells a program like "student accident" coverage. Commissions are usually higher, as administrative duties of the agency are greater.

## Lack of Fiduciary Duty:

Weiser was selling an insurance policy to members of an association. The members were free to determine the value of the coverage. If the coverage was of interest, they could secure the coverage through participation in the Retiree Association. Some members did participate, and some members did not. [Dep. Ex. Cohen 16; Dep. Ex., Cohen 24; Dep. Ex., Cohen 27] There was no compulsion to participate, nor was the coverage declined to any and all comers.

Weiser never had a fiduciary duty to the participants of the Retirees' Association benefit plan. Weiser is merely an insurance broker, bringing Interboro and the TWU together. Interboro is an insurer admitted to transact insurance business by the Commissioner of Insurance of the State of New York.

An insurance company accepting risk must charge adequate premiums on all policies to cover potential losses. There are no safeguards in place to prevent only those who are very likely to need the benefits to apply. For this reason, insurance premiums must be set not based on the loss ratio of the group itself, but on the potential losses that can occur based on the possibility of anti-selection against the insurer.

With association insurance, retention and claims ratios are not considerations of the insurer. There is no "industry standard" that would require Weiser to wrest a premium refund or dividends for the TWU. Allowing individuals to select the coverage at will, there is potential for unexpected future loss. On one of the excursions or cruises offered to the members of the Retirees' Association, a common disaster could aversely affect the good claims experience enjoyed to this point. The insurer of such a group must be financially sound to withstand that kind of occurrence. What the current TWU management has done, is shift fiduciary responsibility to the TWU management. Without proper safeguards in place, that shift in responsibility could be dangerous.

## Conclusions:

1.   Interboro provided a limited benefit program to the membership of the Retirees' Association, to meet a limited need for additional benefits.



# ConPert, Inc.

Mr. Daniel G. Ecker
Mr. Jordan Sklar
May 9, 2007
Page, 6

2.    Weiser was paid a commission commensurate with the duties that Weiser assumed in facilitating the administration of the Retiree's Association insurance plan.

3.    There is no evidence presented that any TWU personnel benefitted from the Weiser affiliation.

4.    No fiduciary duty was owed by Weiser to the Trustees or members of the Retirees' Association.

5.    The claims ratio of the Retirees' Association Plan violates no industry standard of care.

6.    Weiser has no duty to the Retirees' Association to seek refunds based on the utilization by the members.

7.    New management at the TWU terminated insurance coverage with Weiser, moving to provide benefits through a non insurance carrier  Alicare.

8.    The Retirees' Association benefit plan is currently uninsured.  Alicare provides no insurance protection against adverse claim experience.  The Retirees' Association and the Trustees  of the TWU plan have assumed, by the termination of the Interboro coverage, full liability for the plan benefits.

Respectfully submitted,

*Charles W Bowden, CLU, ChFC*

Charles W. Bowden, CLU, ChFC
Principal, ConPert, Inc.

# EXHIBIT B

1

# COPY

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3   -------------------------------------------x
    JAMES MAHONEY, as Director of the Transport

4   Workers Union Local 100 Retirees' Association
    and Plan Administrator of the TRANSPORT WORKERS

5   UNION LOCAL 100 RETIREES' ASSOCIATION HEALTH
    BENEFIT PLAN, JOSEPH ALLMAN, BERNARD BEAVER,

6   FRANK INGRAM, LAVERNE STUCKEY, MAURICE SCHIERMAN
    and MATTHEW TARNOWSKI,

7                           Plaintiffs,
                    -against-

8   J.J. WEISER AND COMPANY, INC., SANFORD J. COHEN,
    HARVEY T. GLUCK, MICHAEL J. FITZPATRICK and JOHN

9   MEEHAN
                    Defendants.

10
    CIVIL ACTION NO.: 04 Civ. 2592 (MBM)

11  -------------------------------------------x

12                          7 Skyline Drive

13                          Hawthorne, New York

14

15                          July 27, 2006
                            10:15 a.m.

16

17

18          DEPOSITION of HARVEY T. GLUCK, one of
    the Defendants herein, pursuant to Notice,

19  before Ronald A. Marx, a Notary Public of the
    State of New York.

20

21

22

23          ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor

24              New York, New York 10022
                     212-750-6434

25                   REF: 81414

108

GLUCK

1
2  week do you go into the Weiser office?

3        A      Four.

4        Q      And when Weiser and Interboro shared

5  space, was there a -- how much communication was

6  there between employees in the two offices?

7                    MR. BABCHIK:  How much

8            communication was there?  I object to

9            the form of the question.

10       A      Rarely.

11       Q      Now, you said that Lois would handle

12  the Retirees' Association claims?

13       A      Yes.

14       Q      Do you know what she did when she had

15  a question regarding any of the claims?

16       A      She went to Gerald Cohen, who was

17  counsel for Interboro.

18       Q      And how do you know that?

19       A      Because she used to tell me she was

20  leaving the office.

21       Q      Did -- and she would tell you why she

22  was leaving the office?

23       A      Sometimes.

24       Q      Did you ever go along with her to

25  speak to Mr. Cohen?

GLUCK

1

2      A      From the information that Lois gives

3  them.

4      Q      Lois would bring the claim documents

5  over to Interboro?

6      A      I don't know that.

7      Q      Do you know who would make the

8  decision if -- to -- if there was a question as

9  to whether a claim should be paid or denied?

10         Do you know who would make that final

11  decision?

12              MR. BABCHIK:  Again, that was

13              asked and answered.  Why are we going

14              over this again?

15              You asked this witness these

16              questions.  If you want to go back in

17              the record we'll go back in the

18              record.  I mean, is there a goal here

19              to be here until 5 o'clock?

20              MS. PILECKI:  We're not going

21              to be here that much longer.

22              MR. BABCHIK:  I object.  It's

23              been asked and answered.

24      A      Gerald Cohen.

25      Q      Other than Gerald Cohen, would

```
1                    GLUCK
2   anybody else be involved in making that final
3   decision as to whether a claim was paid or
4   denied?
5                    MR. BABCHIK:  Asked and
6               answered.  Over objection.
7                    MS. PILECKI:  I don't believe
8               that question was asked.
9   A      No.
10  Q      Do you know if after Mr. Gerald Cohen
11  made the decision to deny or pay a claim,
12  whether there was any appeal process for the
13  claimant?
14  A      I don't know.
15                   MS. PILECKI:  That's it for
16              today.
17                   MR. BABCHIK:  Would you mark
18              this Gluck 38?
19                   (Gluck Exhibit 38, letter dated
20              6/22/06, was marked for
21              identification, as of this date.)
22                   MS. PILECKI:  What was it
23              marked?
24                   MR. BABCHIK:  Gluck 38.
25                   MS. PILECKI:  Are we going to
```

# EXHIBIT C



# TRANSPORT WORKERS UNION
## OF GREATER NEW YORK • AFL-CIO • LOCAL 100

ROGER TOUSSAINT
President

ED WATT
Financial Secretary-Treasurer

NOEL ACEVEDO
Recording Secretary

CONNIE FRIEL
Vice President
(MaBSTOA)

GEORGE JENNINGS
Vice President
(Private Lines)

AMIN KHAN
Vice President
(TA Surface)

DARLYNE A. LAWSON
Vice President
(Stations)

NEIL PERSAUD
Vice President
(Car Equipment Dept.)

JULIO C. RIVERA
Vice President
(Maintenance of Way)

TIM SCHERMERHORN
Vice President
(Rapid Transit Operations)

## *MEMORANDUM*

**TO:**        Jimmy Mahoney

**FROM:**    Roger Toussaint

**DATE:**     January 27, 2004

**RE:**        Retirees Association

Per my instructions to you this past weekend, the Retirees Association is to immediately discontinue sending any monies to Weiser.  The report that Weiser has been returning 5-10% of the monies forwarded to Weiser in the form of claims payment (and mailing costs) compared to a reported industry average of closer to 60% is shocking and unconscionable.

Pending a review and substitute arrangement the Retirees Association should ensure that there is no reduction in monies that would have been forwarded to retirees (within the limits of the law of course).

RT:vj
opeiu-153

cc:    D. Lawson
       T. Meginnis
       T. Kennedy
       E. Watt

000015

80 West End Avenue, New York, N.Y. 10023   Tel. 212-873-6000   Fax. 212-579-2381

# EXHIBIT D

# INTERBORO MUTUAL INDEMNITY INSURANCE COMPANY

### SEND TO:  J.J. WEISER & COMPANY INC.
131 MINEOLA BOULEVARD SUITE #2, MINEOLA NEW YORK 11501
(516) 294-6152        OUTSIDE NEW YORK 800-645-6177

## (GROUP INSURANCE)

# STATEMENT OF CLAIM

POLICY NO............... CERTIFICATE NO.............CLAIM NUMBER................................

## TO BE COMPLETED BY EMPLOYEE OR MEMBER

1.  Mr. ☐Mrs. ☐Miss ☐.........................................Age.........Date of Birth [................]
2.  Claim is made for ☐Self
    ☐Spouse .........................................Age.........Date of Birth [................]
    ☐Child
3.  Home Address...........................................................................
    (Street and Number)              (City)              (State)              (zip)

    Telephone Number (___) ....................................
4.  Name of Employer............................................................................
5.  Nature of Sickness or Injury..............................................................
6.  Is disability due to injury?................................................................
7.  Did injury or sickness occur during the course of employment?...........................
8.  Have you presented a Workmen's Compensation claim?.....................................

The above answers are true and complete according to the best of my knowledge and belief.

Date.................................                    Signature....................................

## ITEMIZED BILLS MUST ACCOMPANY CLAIMS

## ATTENDING PHYSICIAN'S STATEMENT

1.  Patients name........................................................................
2.  Date of first treatment............................................................
3.  Nature of sickness or injury.......................................................
4.  When was sickness contracted or injury............................................
    Sustained............................................................................
5.  Indicate any physician who rendered previous treatment.............................
6.  Date performed......................................Operation by Dr....................
7.  Where performed.................................. If in hospital, inpatient ........out patient..........
    What hospital.........................................................................
    Telephone Number........................         Signed ................................
    Date........................................         Physician's Name....................

### Authorization for Patients Record

I hereby authorize any hospital, physician, or other person who has attended me or examined me, to disclose when requested to do so by the Interboro Mutual Indemnity Insurance Company, or its representative, any and all information with respect to any illness or injury, medical history, consultation, prescriptions or treatment, and copies of all hospital or medical records.  A photostatic copy of this authorization shall be considered as effective and valid as the original.

C02515

Return Address:

Your Name

**REDACTED**

Address

City                    State              Zip





**TRANSPORT WORKERS RETIREES'**
Claims Department
155 Mineola Blvd.
Mineola, New York 11501

1150143920 02

TELS1319

# EXHIBIT E

# CONSTITUTION AND BY-LAWS

## OF THE

## TRANSPORT WORKERS UNION LOCAL 100 RETIREE ASSOCIATION

001580

# ARTICLE I

## NAME

The Transport Workers Union Local 100 Retiree Association is a non-profit, unincorporated organization of retired persons, a majority of whom were members of the Transport Workers Union, Local 100 prior to their retirement.

# ARTICLE II

## PURPOSE

1.      To protect, preserve and improve the social and economic status of retirees in accordance with the ideals of trade unionism; to engage in such political, educational, cultural, civic, charitable and social and such other community activities intending to further the interests of the organization and its members; to cooperate with other organizations having purposes and objectives similar to those of this organization; and for such additional purposes and objectives not inconsistent therewith as will promote the interest of the organization and its members.

2.      To engage in and support through public education and activities the ongoing efforts by Local 100 before the United States, New York State and New York City Governments to provide a secure and healthy retirement for retired members of Local 100.

3.      To engage in and support actions in support of Local 100's efforts to negotiate fair and just terms of its labor agreements that relate to retirement benefits.

001581

## ARTICLE III

## UNION AFFILIATION

1.     This organization is affiliated with the Transport Workers Union, Local 100 and will give due and serious consideration to the recommendations made by the Transport Workers Union, Local 100 through its Director of Retiree Organizations, reserving, however, the right to make its own decisions.

2.     No action taken by the TWURA shall be construed as imposing any responsibility or liability upon the Transport Workers Union, Local 100.

## ARTICLE IV

## EXECUTIVE BOARD AND DIRECTOR

1.     The highest authority of the Retirees Association between meetings of the general membership shall be the Executive Board.

2.     The Executive Board shall be composed of 10 members elected from the general membership for a two year term at a regular membership meeting in May or June of 2004 and every two years thereafter.  Any member of the Association in good standing may be elected as a member of the Executive Board.  The Board shall meet at least six (6) times per year or as called by the Director.

3.     The Chair of the Executive Board shall be the Director of the Retiree Association who shall be appointed by the President of Transport Workers Union, Local 100 and who shall serve without a vote.

001583

4.    The Director shall also serve as the executive officer of the Retirees Association and shall make reports of his activities or a regular basis to the Executive Committee. The Director shall also make a quarterly report to the Local 100 Executive Board on the activities of the Association and its Chapters.

## ARTICLE V

## CHAPTER STRUCTURE

1.    Any seven (7) or more retired members of the Transport Workers Union, Local 100 residing in any particular geographic area may form a TWURA Chapter with the approval of the Director and the Executive Board of Local 100. The approval shall take the form of a charter issued by the President of the Transport Workers Union, Local 100 with the approval of the Executive Board of Local 100, incorporating the names of the applicants.

2.    Any Chapter may admit to membership any retiree or the spouse of a retiree who was not a member of the Transport Workers Union, Local 100 provided that such additional non-Local 100 persons at no time shall exceed more than one-third (1/3) of the members of the Chapter.

3.    Each Chapter shall adopt a set of by-laws subject to the approval of the Director. Except as otherwise provided in its by-laws, the officers of each Chapter shall consist of a President, one or more Vice Presidents and a Secretary-Treasurer. The officers shall constitute the Chapter's executive committee.

4.    Except as otherwise provided in a Chapter's by-laws, membership dues shall be established and modified by the Executive Board of the Association. Any member two months in arrears in dues payments shall be in bad standing.

-3-

001583

5.      Any member in good standing may run for and hold any office of the Chapter, except only that where a Chapter has been in existence for one year or more no member shall be eligible to hold the office of chapter President unless he or she has been in continuous good standing for at least six (6) months prior to nominations.

6.      The initial election of officers shall be held at the meeting at which the charter is presented to the Chapter.  Thereafter, the election of officers shall be held every two years for a two-year term.

7.      A general membership meeting of the Chapter shall be held monthly, except that meetings may be dispensed with during the summer months.

8.      The endorsement of any candidate for political officer, the support of any particular legislative program, and the expenditure of more than $250.00 shall require the approval of the membership at a membership meeting.

10.      Twenty-five percent (25%) of the good standing membership shall constitute a quorum.  A Chapter may amend its by-laws by a two-thirds (2/3) majority vote of the members at a general membership meeting.  A by-laws amendment, however, shall not become effective until approved by the Director.

## ARTICLE VI

## REVOCATION OF CHARTER

1.      Should any Chapter engage in activities which the Executive Board of Transport Workers Union, Local 100 considers to be prejudicial to the interests of the Transport Workers Union, Local 100 and its members, the Executive Board of Local 100 may revoke such Chapter's

001584

charter.

    2.       Should the membership of any Chapter decline to the point that, in the opinion of the Director, it can no longer function effectively, the Executive Board of Transport Workers Union, Local 100 may, at the recommendation of the Director and the Retirees Association Executive Board, revoke the charter.

    3.       When a Chapter's charter is revoked, any assets it may have shall be distributed to a local non-sectarian charitable organization as determined by the Retirees Association Executive Board.

## ARTICLE VII

## AMENDMENT

    1.       These By-laws may be amended by a vote of the Executive Board of Local 100.

    2.       The Executive Board of the Association may propose amendments from time to time in these By-laws for consideration by the Local 100 Executive Board.

001585

# EXHIBIT F

**COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------X
JAMES MAHONEY, as Director of the               INDEX NO.
Transport Workers Union Local 100               04 Civ.2592
Retirees' Association and Plan                  (MBM)
Administrator of the TRANSPORT WORKERS
UNION LOCAL 100 RETIREES' ASSOCIATION
HEALTH BENEFIT PLAN, JOSEPH ALLMAN,
BERNARD BEAVER, FRANK INGRAM, LAVERNE
STUCKEY, MAURICE SCHIERMAN and MATTHEW
TARNOWSKI,
          Plaintiffs,

-against-

J.J. WEISER AND COMPANY, INC., SANFORD
J. COHEN, HARVEY T. GLUCK, MICHAEL J.
FITZPATRICK AND JOHN MEEHAN,
          Defendants.
---------------------------------X

RECEIVED
SEP 20 2006
BABCHIK & YOUNG, LL

                    9:30 a.m.
                    September 6, 2006

                    113 University Place
                    New York, New York

     EXAMINATION BEFORE TRIAL of LAVERNE STUCKEY,

taken by DEFENDANTS, before ALBERT M. CITTONE, a

Certified Court Reporter and Notary Public of the

State of New York.

**CITTONE REPORTERS**
**Certified Shorthand Reporters**
Two Penn Plaza, Suite 1500
New York, New York 10120
(212)286-9222

16

1                    LAVERNE STUCKEY

2      get insurance from the Retirees' Association?

3              A      GHI was my main supplier and I

4      had two other supplemental providers.

5              Q      Who were the two other

6      supplemental providers?

7              A      AARP and J.J. Weiser.

8              Q      What did AARP pay?

9              A      Around $240.

10             Q      That was for the first five days

11     of the hospital stay?

12             A      Yes.

13             Q      Then J.J. Weiser kicked in --

14             A      $10.71.

15             Q      Is that because you didn't have a

16     longer stay at the hospital?

17                    MS. PILECKI:   Objection.  You can

18                    answer, if you know.

19             A      I don't know, I'm not certain.  I

20     was under the impression that five days or

21     better was comparable to about a 150, $200 from

22     J.J. Weiser.

23             Q      When you got a check for $10.71,

24     did you put in a complaint about that?

25             A      I made a phone call.

17

1                        LAVERNE STUCKEY

2           Q     Who did you talk to?

3           A     Someone at J.J. Weiser.  The name

4     is probably in my records I may have at home,

5     I'm not certain.

6           Q     What did they say to you?

7           A     She just simply assured me this

8     was all I was entitled to.

9                 MS. TONGRING:  Hold on one

10               second.

11               (Conference.

12          Q     Do you know the terms of the

13    policy that J.J. Weiser provided to the members

14    of the Retiree Association?

15          A     It's been a long time since I

16    looked -- I'm not clear, I'm not certain.

17          Q     After you spoke with the woman

18    from -- was it a woman you spoke to?

19          A     Yes.

20          Q     After you spoke with a woman from

21    J.J. Weiser, did you do anything else about the

22    insurance?

23               MS. PILECKI:  Objection.  You can

24               answer.

25          A     I may have called the

18

LAVERNE STUCKEY

1

2     representative of the Retirees' Association.  I

3     am not certain of the outcome because I had

4     other things to worry about and to deal with and

5     since it was a minimal amount I was entitled to

6     I simply let it go.

7               Q     Let's go through this part about

8     all these policies you had.

9                     Is it your testimony -- we're

10    talking about five days that you weren't paid

11    for, for a medical stay, by J.J. Weiser's

12    policy; is that right?

13              A     Yes.

14              Q     But you got $10.71; is that

15    correct?

16              A     Yes.

17              Q     You had a policy from AARP that

18    paid $240 towards that same five days?

19              A     Yes.

20              Q     You had GHI that paid for the

21    entire five days?

22              A     That's correct.

23                    MS. PILECKI:  Do you understand

24              what's meant by the entire five days?

25                    MS. TONGRING:  Counsel, this is